**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TRUSTEES OF THE CHICAGO PLASTERING ) <br> INSTITUTE PENSION TRUST, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SOLARCRETE ENERGY EFFICIENT ) <br> BUILDING SYSTEMS INC., ) <br> ) <br> Defendant. ) | Case No. 04 C 7820 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

Plaintiffs have brought the instant case against Defendant Solarcrete Energy Efficient Building Systems, Inc. ("Solarcrete") pursuant to the Labor Management Relations Act, § 301 and § 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"). Plaintiffs sought to compel an audit, and now seek to recover delinquent contributions revealed by that audit. A bench trial was held on October 22, 2007, October 25, 2007, and January 20, 2009. The following opinion represents the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure as to liability only.[1] The issue of damages will be briefed subsequently.

### I. FINDINGS OF FACT

**A.    The Parties**

1.    Plaintiffs Chicago Plastering Institute Pension Fund, Chicago Plastering Institute Health and Welfare Fund, Chicago Plastering Institute Retirement Savings Fund, and the Journeymen Plasterers' Protective and Benevolent Society of Chicago Apprentice and Training Fund

---

[1] To the extent that any findings of fact may be considered conclusions of law, and any conclusions of law may be considered findings of fact, they shall be so considered.

are employee benefit plans within the meaning of Section 3 of ERISA, 29 U.S.C. § 1002(3). Plaintiff Chicago Plastering Institute ("CPI") is a promotional trust fund that promotes the plastering industry, and Plaintiff Chicagoland Safety Council ("CEA") is an area wide safety council for whom the CPI collects and forwards contributions. These plaintiffs are referred to collectively as the "Funds."

2. Plaintiff Journeymen Plasterers Protective and Benevolent Society of Chicago, Local No. 5 (the "Union"), is a labor organization within the meaning of Section 2 of the Labor Management Relations Act, 29 U.S.C. § 152(5), and an employee organization within the meaning of Section 3 of ERISA, 29 U.S.C. § 1002(4).

3. At the time of the filing of the instant action, Plaintiff Ronald Bowser was a trustee, fiduciary, or agent of the Funds and the Union. Plaintiff John Manley is currently a trustee, fiduciary or agent of the Funds and the Union.

4. This lawsuit involves events in the time period from May 1, 1997, through November 30, 2004 (the "Audit Period").

5. Defendant Solarcrete is an Illinois corporation that operated during the Audit Period as a construction contractor. Solarcrete was a privately held corporation, with 100% of the shares held by Peter J. Konopka ("P. Konopka") and his wife, Kathleen M. Konopka ("K. Konopka"). P. Konopka was Solarcrete's President throughout the Audit Period, and K. Konopka was its corporate Secretary.

6. Solarcrete worked both as a general construction contractor and as a specialty builder of buildings using a pre-fabricated, highly insulated wall system referred to as "Solarcrete." The walls are built using special wall panels pre-fabricated at Solarcrete's shop from Styrofoam and rebar, taken to the job site, and erected. Then "shotcrete," a form of cement, is sprayed onto the wall

2

panels. The walls are finished in a variety of ways, including either (a) permitting the cement to completely dry and then painting the wall; (b) permitting the cement to set but not fully dry, and then giving a textured finish using trowels or stencils; or (3) permitting the cement to dry, and applying a coat of plaster over the wall, resulting in a more finished look.

**B.      The Collective Bargaining Agreement of the Fund and Union Generally**

7.      The Chicagoland Association of Wall and Ceiling Contractors ("CAWCC") is a voluntary membership organization that negotiates collective bargaining agreements with the Union. Solarcrete has never been a member of the CAWCC.

8.      The CAWCC and the Union were signatories to a series of collective bargaining agreements throughout the Audit Period, including the June 1, 1993 through May 31, 1997 Agreement, the June 1, 1997 through May 31, 2000 Memorandum of Understanding, the June 1, 2000 through May 31, 2004 Agreement, and the June 1, 2004 through May 31, 2007 Agreement (collectively, the "CBAs"). The CBAs provide for terms and conditions of employment for employees of signatory employers performing plastering work within the Union's geographical jurisdiction, which consisted of the Illinois counties of Cook, DeKalb, Grundy, Kane, Kendall, LaSalle, Livingston, McHenry, and Will.

9.      The Funds are third-party beneficiaries of the CBAs between the CAWCC and the Union.

10.     The CBAs require signatory contractors to remit contributions to the Funds based on hours worked by, and in the case of the Retirement Savings Fund, hours paid to, their plastering employees. The CBAs also require signatory contractors to withhold dues from the paychecks of employees who have completed a dues deduction authorization and to remit them to the Union. The

3

dues to be withheld are, like the Fund contributions, calculated on the basis of the number of hours the employee works.

**C.     Solarcrete's Affiliation with the CBAs**

11.     Plaintiffs seek to collect contributions and payments from Solarcrete from throughout the Audit Period.

12.     In May, 1997, Solarcrete was engaged in a particularly large job referred to as the "Roman Addison job." Solarcrete needed additional workers skilled in plastering, and the job was to continue for several more months, and did continue until December 1997. Solarcrete and the Union had never worked together before, but when Solarcrete was approached by the Union, it agreed to use union labor for the Roman Addison project.

13.     On about May 16, 1997, Solarcrete executed a pre-printed agreement with the Union (the "1997 Agreement") that states that Solarcrete "desires to employ members of Plasterers' Local #5 on an intermittent or casual basis" and "agrees to do all work in accordance with the wages, hours, fringe benefits and other conditions of employment which are now in effect by virtue of the Agreement between the Plastering Contractors of Cook, Will, Grundy, McHenry, Kane, LaSalle, Livingston, and DeKalb Counties, and the Journeymen Plasterers' P&B Society, Local #5." The referenced agreement between the Plastering Contractors and the Union sets forth wages and benefit contribution rates for the period June 1, 1996, through May 31, 1997. Handwritten on the 1997 Agreement are the words, "(FOR ROMAN ADDISON JOB ONLY -) PJK," the last three letters being the initials of P. Konopka. The agreement is signed by P. Konopka for Solarcrete and by Richard Dahm, then the Vice President of the Union. P. Konopka wrote in the above phrase before he and Dahm signed the 1997 Agreement.

14. On about June 1, 1998, Solarcrete executed a Memorandum of Understanding (the "1998 MOU") which modified the CBA that had existed from June 1, 1993 through May 31, 1997.

    a. The 1998 MOA is a two page document. It consists of an opening paragraph (the "preamble"), three sections identifying changes to three different articles in the prior CBA, and a concluding paragraph (the "coda").

    b. The preamble states that the CBA that had existed from June 1, 1993 through May 31, 1997 (the "1993 CBA") "is hereby amended and extended for the three year period beginning on June 1, 1997 and expiring on May 31, 2000." The first section identifies changes to Article V of the 1993 CBA, reflecting an increase in wages to be paid. The second section identifies changes to Article XLVII of the 1993 CBA, reflecting an increase in contribution rates. The third section identifies changes to Article LIV of the 1993 CBA, reflecting alterations to the manner in which the CBA could be terminated. The coda states, "In all other respects, the current Collective Bargaining Agreement dated June 1, 1993 and expiring May 31, 1997 as amended by the above listed changes is hereby confirmed and ratified for the period beginning June 1, 1997 and expiring May 31, 2000." Below the coda appears the signatures of P. Konopka and a Union representative.

    c. Prior to signing the 1998 MOU, P. Konopka inserted a handwritten sentence. The sentence appears just before the end of the third section, close to but above the coda. The sentence states, "FOR HUNTLEY COMMONS GATEWAY JOB ONLY OTHERS AS NEEDED & SIGN," followed by a mark that could possibly constitute initials, but is illegible.[2]

---

[2] The relevant text of the 1998 MOU, including (1) the third section; (2) P. Konopka's addition (typed in capital letters); and (3) and the coda, is as follows:

    Article LIV - "Termination" shall be changed to read as follows:
        "Subject to Article V(b), this Agreement shall remain in full force
        and effect through May 31, 2000 and shall thereafter continue in
        effect for three (3) year periods except as hereinafter provided. . . .

**D. Solarcrete's Interaction with the Union and Funds**

15. After signing the 1997 Agreement, and continuing after signing the 1998 MOU, Solarcrete filled out monthly contribution reports and sent the reports to the Funds every month from May 1997 through and including January 2008.

    a. Many reports indicate that work covered by the CBAs was performed, even though no written agreement for that specific job existed. For example, the Roman Addison job that is referenced in the 1997 Agreement ended in December, 1997, and the Huntley Gateway Community job referenced in the 1998 MOU did not begin until June, 1998. Nevertheless, in January 1998 Solarcrete reported to the Funds and the Union thirty-two hours of work, and made contributions for the same.

    b. Many monthly reports indicated that no covered work occurred during that period, and no payments were made on those reports.

---

> This Agreement may be terminated as to a non-member of the Association who is bound by this Agreement, effective on May 31, 2000 or on the three (3) year anniversary thereof by a written notice of termination given by either the Union or such non-member of the Association to the other at least sixty (60) days, but no more than ninety (90) days, prior to the effective date of termination stated in the notice. Unless this Agreement is terminated in accordance herewith, this Agreement as modified or amended from time to time shall apply retroactively and shall be binding upon the Union, the Association, all members of the Association, and all non-members of the Association who are signatory to this Agreement."

FOR HUNTLEY COMMONS GATEWAY JOB ONLY OTHERS AS NEEDED & SIGN
The balance of Article LIV is unchanged.
In all other respects, the current Collective Bargaining Agreement dated June 1, 1993 and expiring May 31, 1997 as amended by the above listed changes is hereby confirmed and ratified for the period beginning June 1, 1997 and expiring May 31, 2000.

1998 MOU.

16. On the reports submitted for each of the months of June through December 2001, January through August 2002, October and November 2003, and April through June 2004, Solarcrete shareholder and officer K. Konopka signed her name directly below the following certification:

> The undersigned employer hereby warrants and represents that this report accurately states all hours worked by all plasterers in its employ. In addition, the employer hereby agrees to be bound to the terms of the current Collective Bargaining Agreement executed between the Chicagoland Association of Wall and Ceiling Contractors and Journeyman Plasterers' Protective and Benevolent Society of Chicago, Local No. 5. Further, the undersigned hereby expressly accepts and agrees to be bound by the trust agreement(s) governing the Chicago Plastering Institute's various fringe benefit funds and accepts all the terms thereof with the intention of providing benefits to its plasterers.

17. After the initial Roman Addison job, Solarcrete continued to use Union plasterers on an intermittent basis. Solarcrete's desire for Union labor fluctuated based on the jobs it was working. When Solarcrete wished to employ Union labor for a particular job, it would contact the Union to attempt to get Union workers. If no Union labor was available but Solarcrete nevertheless wished to have its plaster workers considered to be Union workers, Solarcrete had its employees fill out temporary Union membership cards so that they would be considered Union employees for that job only.

18. At various times throughout the Audit Period, some individuals who were employed by Solarcrete applied for full, regular membership in the Union. This finding is based on records of union membership forms filled out by individuals whom the Union contends work for Solarcrete. The Plaintiffs introduced records of thirty-seven individuals who applied for Union membership, and who, according to the testimony of Union representative Chester Fester, worked at Solarcrete. *See* Pl. Ex. 19. Fester testified that the application forms themselves would not identify the employer of the union member. However, a review of the actual forms shows that starting sometime

7

in 1998 the forms included two questions: the identity of the applicant's employer; and the party that referred the applicant to the Union. Many of the applications contain references to Solarcrete or to other employers in response to these questions. The thirty-seven records produced break down chronologically as follows: (1) thirteen records were signed prior to the Audit Period; (2) nine records were signed when Solarcrete was working the Roman Addison job; (3) four records were signed when Solarcrete was working the Huntley Gateway Commons job; (4) one record was signed on April 6, 1999, by Tommy Hardy, but the form states that Hardy was joining the Union so that he could work for an employer that is not Solarcrete; (5) seven records were signed on September 25, 2000, and six of these state that the applicant was either referred by Solarcrete, or that Solarcrete was the applicant's employer; and (6) three records were signed in 2003 and 2004, but they make no reference to Solarcrete.

19. On about June 15, 2001, K. Konopka wrote a letter to the CPI apologizing for being delinquent in sending contribution reports to the Funds for the months from October 2000 to March 2001 and asking the Funds to waive any late payment fees. With the letter, K. Konopka submitted the delinquent reports and any fees Solarcrete believed it owed.

20. Sometime in or around 2004, Fester visited a job site in Homer Glen, Illinois, where Solarcrete was working. Fester observed Solarcrete employees spraying shotcrete onto wall panels and applying plaster finishes to the concrete. Fester spoke with two employees and confirmed they were not members of the Union. Fester spoke to P. Konopka the next day, and P. Konopka agreed that the two employees with whom Fester had previously spoken would become members of the Union, and that Solarcrete would hire two additional employees through the Union for that job. Fester further testified that P. Konopka did not raise any objection that Solarcrete was not obligated to hire Union employees for the Homer Glen job.

### E. Audit Report and Solarcrete's Record Keeping

21. As part of the CBAs, the Funds are entitled to do an audit of employers to ensure that employers are fulfilling their CBA obligations. The Funds sent Solarcrete notice of an audit on May 5, 2004. Solarcrete initially refused to submit to an audit, claiming no records were available. This suit was filed on December 3, 2004, and Solarcrete defaulted. An order was entered compelling Solarcrete to submit to the audit, but Solarcrete continued to refuse to do so. The Funds filed a motion seeking an order to show cause on January 23, 2006. The motion was withdrawn when Solarcrete agreed to participate in the audit.

22. Solarcrete produced some documents, including payroll registers, quarterly payroll tax returns, and contribution reports submitted to the Funds. However, other documents ordinarily considered in an audit were unavailable, including cash disbursement journals, 1099 forms, and employee time cards. An audit report was completed on January 31, 2007 ("January Audit Report"). Because of the lack of documents produced, the auditor had to make various estimates based on, *inter alia*, Solarcrete's tax returns and payroll registers.

23. The bench trial in this case commenced on October 22, 2007. During the first day of the bench trial, P. Konopka revealed for the first time that he had access to numerous employee time cards. The bench trial was adjourned so that the auditor could consider this new trove of information, which constituted approximately 2,500 time cards.

24. A second audit report, based on the time cards, was then produced. This report was based on a comparison of the specific time cards produced by Solarcrete to the contribution forms Solarcrete submitted to the Union. There remained numerous discrepancies, both in terms of hours reported on time cards not appearing in the contribution forms, and also in terms of individuals being listed on the contribution forms for whom no time cards existed. By comparing the time cards

9

produced to the other relevant data, the auditor made a calculation of the amount of additional contributions owed.

25. The time cards showed hours worked as reported by the employees, and the work was broken down into various categories. These categories include (1) Wall Erection, (2) Wall Prep, (3) Shotcrete,(4) Finish Coat," and various other categories that clearly do not relate to the CBA. Some time cards did not specify a category, noting only the hours worked. These hours will be referred to as "Uncategorized Hours."

26. At the trial, P. Konopka estimated that about forty percent of the labor hours expended in building with Solarcrete walls were incurred fabricating the walls at the shop; fifteen percent in erecting them at the site; thirty-five percent in applying shotcrete; and ten percent in finishing the walls.

## II. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over the claims of the plaintiffs pursuant to 28 U.S.C. §§ 1337, 185(c), 1132(e)(1), and Section 301 of the LMRA.

### A. Time Periods Covered by the CBAs

2. Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under . . . the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of . . . such agreement." 29 U.S.C. § 1145. As stated in *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768 (7th Cir. 2002), Section 515 was intended to "permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor management relations law . . . ." *Id.* at 778 (quoting 126 Cong. Rec. 23039 (statement of Rep. Thompson)).

3.  The Funds are third party beneficiary of any contracts between Solarcrete and the Union. But unlike typical third party beneficiaries, "ERISA plans are akin to 'holders in due course in commercial law, generally entitled to enforce contracts without regard to understandings or defenses applicable to the original parties.'" *Wis. UFCW Unions & Employers Health Plan v. Woodman's Food Market, Inc.*, 348 F. Supp. 2d 1005, 1009 (W.D. Wis. 2004); *Robbins v.* Lynch, 836 F.2d 320, 333 (7th Cir. 1988) ("just as the Federal Deposit Insurance Corp. is not bound by undisclosed promises of insured banks . . . ., so pension funds get the benefit of the written terms of all agreements"). The Funds are entitled to enforce the contracting parties' agreement as written. *Cent. States, Se. & Sw. Areas Pens. Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989).[3]

4.  Any side agreements between a union and an employer cannot be enforced against the Funds. *Id.*; *see also id.* at 1150 (noting that union and employer did not inform the ERISA plan of their side agreement not to enforce the documents that the union and employer had signed). The reason for this rule is at least partially based on the concept of notice. ERISA funds must be on clear notice of their obligations and expectations because they rely on aggregate actuarial calculations to maintain their viability. *See Moriarty v. Brust Funeral Home, Ltd.*, No. 95 C 333, 1995 WL 472771 at *4 (N.D. Ill., Aug. 8, 1995) (citations omitted). Where notice of an alteration is not clearly given to an ERISA fund, the language of a printed and signed form will be given effect. *Gerber Truck*, 870 F.2d at 1153. Thus if both the union and the employer intended to alter a pre-printed form and

---

[3] The Union is also a plaintiff to this action. The general rule that a third-party beneficiary ERISA fund is not bound by any legitimate side-agreements would not appear to apply to the Union since the Union would have been a member of these side-agreements. However in their briefings both parties have treated the Union and the Funds uniformly, possibly because any liability Solarcrete has to the Union is relatively minor as compared to the Funds. For purposes of this opinion, the court will not delineate between the Union and Funds plaintiffs.

11

made alterations but those alterations were "cryptic," then the ERISA fund is entitled to ignore the alterations. *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1024 (6th Cir. 2001). However, when the alterations are written clearly on the pre-printed form, by for example writing at the top of the signature page that the agreement applied to one job only, the ERISA fund would have notice of the terms of the agreement and must abide by the alterations. *Id.* (discussing *Craig v. Severino, Inc.*, No. 93-3516, 1994 WL 259456, 1994 U.S.App. LEXIS 14715 (6th Cir. June 13, 1994)).

  5. The parties dispute whether the alterations to the 1997 Agreement and 1998 MOU are sufficiently clear that the Plaintiffs should be bound by them, or whether they are so obscure that they can be disregarded entirely. This legal question need not be resolved; for the remainder of this Order the court will assume that the alterations to the 1997 Agreement and 1998 MOU were clear and that Solarcrete manifested an intent to be bound only to the Roman Addison and Huntley Gateway Commons jobs by signing those documents.

  6. The written agreements do not end the inquiry into Solarcrete's obligations. A party can bind itself to a CBA without actually signing a paper stating the same. It is a "well-established principle that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound[;] rather all that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." *Bricklayers Local 21 of Ill. Apprenticeship and Training Pgm. v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004) (internal quotation marks, alterations, and citations omitted). Factors that show an intent to be bound may include (1) consistently submitting monthly contribution reports; (2) paying fringe benefit contributions to an ERISA fund that is in accordance with the terms of the CBA; and (3) signing contribution reports

which contain certification language indicating that the contributions were made pursuant to the obligations of the CBA. *Id.*

7. Solarcrete's conduct throughout the Audit Period, including the periods not covered by the 1997 Agreement and 1998 MOU, demonstrate to a reasonable and objective observer that Solarcrete was operating as though it were bound by the CBAs. Solarcrete consistently sent in monthly reports, even for periods where no covered work was occurring, and apologized to the Funds when payments were late. Solarcrete paid contributions for work performed during various periods not covered by the 1997 Agreement and 1998 MOU, starting as early as January 1998, the month after the Roman Addison job ended. Starting in 2001, the reporting forms contained language directly above the signature block affirming that the signatory was bound by the CBA then in effect; Solarcrete signed these forms without making alterations similar to those appearing in the 1997 Agreement and 1998 MOU. Solarcrete consistently made contributions and paid wages at the rates specified in the current CBA. Finally, when Solarcrete was approached by Fester, who complained that a particular job in 2004 lacked union employees, Solarcrete agreed to have two of its current employees become union members and agreed to hire additional employees.[4] None of these acts in isolation would necessarily be sufficient to confirm that Solarcrete had implicitly assented to the CBAs, but the combination of events suggests that Solarcrete was operating as though it were bound by the CBAs. *See id.*

---

[4] The court notes that none of the union membership reports submitted by the Plaintiffs—which purport to represent *all* union memberships throughout the Audit Period—corroborate the testimony by Fester that this event occurred. *See* Pl. Ex. 19. Only three people joined after the year 2000, but none were at or near the same time. The closest individuals joined the union on April 29, 2004 and May 28, 2004. Nevertheless, Fester's testimony was not controverted by Solarcrete, and is taken as true.

8. Solarcrete attempts to explain its conduct by contending that it entered into a series of oral agreements with the Union on a job-by-job basis. Indeed, some (though not all) of its conduct would be consistent with this theory—especially its payment of contributions during periods when no written agreement was in place. But other conduct is clearly inconsistent with this explanation, especially the fact that Solarcrete consistently submitted report forms, even for periods when no covered work was occurring; under Solarcrete's theory, it had no obligation to tell the Funds and the Union anything during those periods.

9. The failure to identify covered jobs in writing is important, not so much because it explicitly defies the handwriting alteration of the 1998 MOU, but more importantly because this oral arrangement makes it impossible for the Funds to determine their entitlements and obligations for plastering work performed by Solarcrete employees, which is the central point in permitting ERISA funds to enforce a contract as written. *See Gerber Truck Serv*, 870 F.2d at 1153. In certain circumstances, an oral CBA or oral modifications to a CBA is possible. *See Merk v. Jewel Food Stores*, 945 F.2d 889, 895 (7th Cir. 1991). However, an oral job-by-job approach is in direct contravention of the text of the CBAs, which provide that *all* plastering work is to be covered, and in this situation parole evidence is inadmissible. *Id.* at 894.

10. Solarcrete further notes that it consistently refused to sign the full CBA when asked, and that it refused to submit to an unlimited audit, both of which could support a finding that it did not believe it was universally bound by the CBA. *See Banner Restoration*, 385 F.3d at 766. Although the first factor supports Solarcrete's position, it does not defeat the overall evidence of Solarcrete's conduct in this case. The second argument cannot be seriously entertained. Solarcrete admits that the CBAs applied for *some* jobs, and thus cannot dispute that it was subject to an audit for at least those jobs. But because Solarcrete lacks any evidence of which jobs were covered by

14

the CBA, it cannot fault the Funds for wanting to audit the entire Audit Period; Solarcrete's own conduct provided the Funds with no other remedy.

11. For the aforementioned reasons, the CBAs apply to the entire Audit Period.

**B.    Types of Work Covered by CBAs**

12. The parties dispute what work is covered by the CBAs. Construction and installation of Solarcrete walls involves essentially four steps: (1) fabrication of the interior part of the wall at the shop; (2) erection of the interior of the wall at the site; (3) spraying Shotcrete onto the wall; and (4) finishing the exterior of the wall, whether by permitting it to dry and then leaving it unfinished; permitting it to dry and then painting it, applying a coat of plaster to the wall, or creating a textured finish using trowels or stencils.

13. All agree that if a plaster finishing is applied, or if trowels and stencils are used to create a textured finish, this finishing work is covered by the CBA.

14. Solarcrete admitted during the trial that the application of Shotcrete is also covered by the CBA, even though P. Konopka stated that he did not personally consider Shotcrete as plasterers' work. There is no dispute that Shotcrete is covered under the CBA.

15. The parties dispute whether wall fabrication and erection is covered. There is some language in the CBA which would suggest that *erection* may be covered, though nothing in the CBA suggests *fabrication* is covered.[5] However, Plaintiffs stated throughout the trial that they were not

---

[5] The CBA states that "[J]ourneymen plasterers and apprentices are erectors of cork where such cork is stuck with adhesives such as asphalt, cement, etc. . . . Where the erection of the cork or other similar insulated board material is within the jurisdiction of the plasterer and to afford proper protection to the owner of the job, it is agreed there shall be no divided responsibility between the erection of the cork and the plastering. Consequently, the cork contractor must contract for both the erection of cork or other similar insulating materials and the plastering." May 31, 1997 CBA at 24, art. XIII, sec. 1 (Pl. Ex. 1).

15

arguing that fabrication or erection work is covered. *See* Jan. 20, 2009 Tr. 9:1–4,[6] 160:2–9.[7] Plaintiffs also conceded that any finishing work involving painting only is not covered. *Id.* at 160:2–9.

16. Therefore, for purposes of this case the CBAs at issue cover the following work only: (1) spraying Shotcrete onto the wall; and (2) the finishing of the wall when the finishing involves either (a) placing plaster on the exterior, or (b) creating a textured finish using trowels or stencils.

## C. Choice of Audit Reports

17. Two audit reports were created, one before the 2,500 time cards were disclosed, and a second one after the 2,500 time cards were disclosed. The parties dispute which report should be used in this case. The court has already ruled that it will order Solarcrete to pay for any additional cost incurred by the Plaintiffs resulting from the tardy disclosure, both in terms of attorneys' fees and the cost of the audit. *See* Jan. 15, 2009 Order. In the same Order, the court stressed that this newly discovered evidence is relevant, and that a fourteen-month delay in the trial was given for a reason: so that the evidence could be considered. Plaintiffs are required to utilize the new audit report in calculating its damages.

18. The parties also dispute how the time cards should be used as evidence of damages. In particular, various time cards contain Uncategorized Hours, and there is no objective manner to determine whether these hours are covered or not covered by the CBAs. Employers have an

---

[6] "But it's the union's contention that the Shotcrete work and then any finish plaster coat that goes on the concrete walls is work that's within its jurisdiction."

[7] "MR. HUFFMAN-GOTTSCHLING: Well, the Shotcrete we claim, and then the finishing — we wouldn't claim the finishing if it were just spraying on paint, but if it were applying a plaster finish to the wall, that would be plasterers' work.
THE COURT: In terms of the construction at the shop, and the erection, that is not plastering?
MR. HUFFMAN-GOTTSCHLING: That's correct."

16

obligation to maintain accurate records under ERISA, and to the extent an employer fails to do so, an auditor may make reasonable assumptions to approximate hours worked. *See Ill. Conf. of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 953 F.Supp. 1026, 1033 (C.D. Ill. 1997). P. Konopka estimated that forty-five percent of labor time spent on installing Solarcrete walls is spent on applying Shotcrete and finishing the walls. The Funds may therefore claim forty-five percent of the Uncategorized Hours as covered under the CBA, so long as there is some basis for supporting that the worker in question did wall installation work.

### III. CONCLUSION

Plaintiffs have requested leave to file an amended motion seeking damages based on this court's determination of both the relevant time periods and type of work covered by the CBAs. This request is granted. Plaintiffs are to file an amended motion for damages within sixty days, and Defendant is to respond twenty-one days thereafter.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 17, 2009